Good morning, may it please the court. Richard Barnett on behalf of the appellant Christian Venegas. We have some exhibits here and we also have copies of those exhibits that the court would like copies to use during the course of these proceedings. I always like to look at pictures. The issue in this case is whether the officers had reasonable suspicion to perform a traffic stop after he was directed by drug agents to perform a traffic stop on Mr. Venegas's vehicle. When they came to this somewhat unusual five-way intersection, they made a snap decision to pull him over. In his opinion, for failing to make a left turn signal as he went in a direct route of traffic to merge onto a road that naturally flows like a river in this case. We have a series of photos. Now this is the government's exhibit. We did a little bit of a blog because it's kind of hard to see on this one. But of course the traffic here and there was some dispute as to what lane he was in. But basically he went directly from this lane straight up here into this lane. That's the whole issue whether he went direct straight or whether he didn't go direct straight. And I think that issue is actually quite clarified from this next exhibit, which is from the expert's testimony, his deposition in which we drew a straight line. And in fact, at page 183 of the excerpt of clerk's record, he stated, that's Mr. Beer, Mr. Vanegas did not even need to turn the steering wheel until passing all the way through the intersection. And the car was merged onto Imperial. Let me ask you, do any of these photographs show a traffic sign which indicates that a person driving as Mr. Kind of hard to see. It's the fourth one in your packet that I provided the court. Right now, what they're saying is that they say we're not going to be able to record you. What they're essentially saying is, and what the officer who stopped Mr. Vanegas said, and it was really not, in the words of this court, capable of rational explanation. He's saying that because there are three arrows on this sign, that arrow number one means you're turning left and you need to signal left. Arrow number three means you're turning right and you need to signal right. But according to the officer who stopped him, and it's his testimony at pages 174 and 153 of the excerpt of clerk's record, because this arrow points straight, if you go like this, across like that, that's going straight and you don't need to signal. And not only does it not make any sense, but their expert said that doesn't make any sense and that's not what I'm relying on. Their expert comes in and he says the significant factor to me is the main change in the name. And, of course, we've cited the direct quotes in our brief where, and I think quite frankly, it was a bit of a surprise to the government when he testified to that, that question. Now, if instead of Lisbon terminating, going through the intersection as it's currently laid out, that particular street was not Imperial but Lisbon and the vehicle made that same movement, would it have to signal? No. So it was the change in the name, and that was the only factor he relied on in deciding that a signal was required. Mr. Barnett, let's say you're right. Let's say you're right. The question is not whether the officer acting as judge and jury could have convicted the driver of a misdemeanor, but whether he had reasonable grounds to think that the driver had committed a traffic violation. In other words, you could be mistaken and still make the arrest if he had reasonable grounds. Now, can you address that and why he had no reasonable grounds to believe that direct meant straight? Well, this really is, of course, this mistake of law, mistake of fact question. And as this Court has held, an officer is entitled to rely on his training and experience in drawing inferences from the facts he observes. But those inferences must be grounded in objective facts capable of rational explanation. And as this Court said in the Lopez-Soto case, which we cited at page or throughout our brief, but at page 29, it makes no difference that an officer holds an understandable or good-faith belief that a law has been broken. Whether the officer's conduct was reasonable under the circumstances is not the proper inquiry. Rather, the correct question is whether a mistake of law, no matter how reasonable or understandable, can provide the objectively reasonable grounds for providing reasonable suspicion or probable cause. The answer is it cannot. A stop based on a subjective belief that a law has been broken when no violation has actually occurred is not objectively reasonable. And if you look at the cases that the parties have cited, you have the dynamic, fast-moving situation where a car zooms by an officer and he looks at the window tinting and he thinks, I think that might be in violation. Or he sees a cracked windshield and he thinks it might be cracked enough that it's a violation. So in that situation, the courts have said you can make a brief stop to take a look and see if there's a violation. That's not the situation here. Every single car, thousands of cars that go through that intersection daily do the same thing that Mr. Venegas did. And, therefore, the facts are not in dispute. The question is, is whether it's a violation of law or not. And, of course, we sent an investigator out there and they have San Diego police cars going through and not signaling. City buses. Just a question. Your client, it looks like there's two lanes in the big blow-up, right? Right. Correct. Your client was in the right lane? Well, that's in dispute. But for purposes of this, it appears the court made a finding in that regard. I can explain that. That he was in the right lane. Yes. Okay. If he had turned hard right, he would have had to signal. Correct. Could he have turned, I'll call it hard left from that lane? Yes. No, because he would have run in. He would have crossed in front of these other vehicles. Okay. When you say lane number two, I assume you mean the one closest to this red car, correct? Yes. Right. Yes. So he can't make a hard left because he's going to cut off these other people in lane number one. Okay. One other question. Sometimes the surface of the street is marked. Is that the case at this intersection? There is some marking. You can see some lines here, right through here. But, again, I would emphasize. No, I meant sometimes when I approach an intersection, there will be a straight arrow with white painted on the street, or a divided arrow indicating that I can either go straight or turn right. And, indeed, over here on 69th Street, you'll see some arrows. Like, for instance, you'll see the arrow pointing to the left turn, and you'll see an arrow going straight. Coming up from where we were coming, there are no arrows. Okay. You look to that traffic information thing that's in your last photograph. That's this one here? Yes. Okay. I'm good. Thank you. But I want to say this. You, I think, were requiring as to whether there's stuff painted on the street. And on these lanes, there are. There are, but not over there. Okay. You've answered my question. Thank you. I only have a minute and 18 left. I think I'd like to reserve it, if I could. Sure. May it please the Court? My name is Michael Running on behalf of the Appellate United States of America. There's no question this was a pretext stop, right? That's correct, Your Honor. But as the Supreme Court said in Wren, as long as there is a reasonable suspicion that a traffic violation occurred, even if another objectively reasonable officer would not have made a traffic stop in that situation, it's still constitutional. So, yes, we do agree that this was done at the behest of narcotics officers. However, this sheriff's deputy was directed to follow this vehicle, develop its own probable cause for a stop, and then identify who was in the vehicle. Mr. Running, there was no possible way that this driver could have continued in a straight, that is a direct, if direct means straight, he couldn't have continued in a straight way, could he? No. If he would have continued in a straight way, according to the diagrams, he would have gone through Lisbon, through the intersection where 69th and Imperial intersect, and if he keeps going straight, he would run into the trolley tracks, which are right over here, so straight, he would have gone like that. Right. This is a unique intersection. Factually, Deputy Stephan testified, and it's in the excerpt of appellate's records, page 51 and 52, page 153, 154, and 151, that this vehicle was in the number two lane, which in the diagram is the second lane. The other factual finding that was made by the district court was on page 207 of the excerpt of record, that from Lisbon to Imperial, it was a change of direction of Van Akes' vehicle to the left of approximately 25 to 30 degrees, so that was one of the factual findings made by the judge, which is consistent with a vehicle not traveling in a direct course of travel.  In the supplemental excerpt of record, on page 36, is a diagram of that intersection from the ground level view. Really, the traffic deputy is not in a helicopter. He was in a car following this individual. This individual went from Lisbon onto Imperial. He was in a lane that had that three-way traffic signal showing the car could go left onto Imperial, straight, which is actually a right onto 69th or a hard right onto Imperial. Now, if he had gone straight as the signal indicated, right, he would have had to make a signal that he was going right. The expert testified to that the individual who actually made the traffic stop wasn't sure and said he would not have. That shows you how confusing this intersection is. Well, he would have had to make a harder right turn to go straight than he made a left turn not to go straight. I believe so. So, in other words, this is an intersection which requires a driver to signal no matter how he decides to go. In that lane, that was the opinion of the expert deputy Beer. You cannot go straight. You cannot go direct in this intersection. From that lane, there is no direct radio channel. This is not a classic intersection where you have a four-way stop sign. This is basically a four-way intersection where a fifth street bisects it, and as the judge correctly noted, somebody must have been drunk when they created this intersection. That is part of the problem with this officer. The question is, was the officer objectively reasonable? And it's the governance position that, yes, he was. Had he worked this intersection before? No, he had not. This is an intersection that's at the edge of San Diego Police Department and the Sheriff's Department jurisdiction. The house that they were surveilling was in the Sheriff's jurisdiction. He was somewhat familiar with this intersection, but it was something he normally didn't patrol, so it was a newer area to him as well. How did he get through the intersection? I don't believe he was asked that question, but he was a car length behind and followed through. You weren't riding in the car with him? No, I was not there, Your Honor. I will tell you that Mr. Barnett had the experts say that 4% of the people signaled. Well, I can tell you on the drive up here, there are a lot of people going faster than 65 and changing lanes without signals, so the argument that just because everybody else does it makes something legal doesn't fly. It's still illegal. According to the deputy who was in the position to see this firsthand, he made a traffic stop based on what he believed was a violation of 22-107, and it's pretty clear that the district court, I think, got this correctly. He mentioned that the officers correctly believed California law required a turn signal making a turn. They correctly observed him proceed through this intersection without making a turn signal, and it did require some deviation from a straight line, and he said based on the observation of the facts, the angle of the intersection, the change in the course of the vehicle, and the absence of a signal given, that it was a good-faith observation, not a mistake of law, and officers don't have to be right, they just have to be reasonable. And Deputy Stephan was asked, and it's in the appellee excerpt of record on page 159 and 160, I asked him myself what was he to do to develop his own probable cause to stop this car. I asked him, what happens if you do not develop probable cause? He would let the car go. He would not have stopped the car that Venegas was in if he did not believe that he witnessed a traffic violation. So this was a reasonable observation on this deputy's part in a unique intersection, and I would ask this court to uphold the ruling of the district court judge because... Were other vehicles moved into that same area? I mean, was the defendant's vehicle the only one that was there at the time? Were there others ahead of him that took that same route that he did? Your Honor, that is not part of the record. I do not believe that Deputy Stephan was asked that question. The focus in terms of the hearing at the district court was solely on the actions of Mr. Venegas's vehicle, which was followed by the deputy's vehicle. If there are no further questions, thank you. I believe you could sit there, if you were a deputy, and pick up a lot of violations there and make a lot of money for the county, huh? I believe that would be correct. It's just a trap in a way, isn't it? I wouldn't call it a trap. It's clearly marked with signs. There's no indication that police have... It's clearly marked with signs, but if somebody were in the lane in which the defendant were in and wanted to follow the arrow straight, that would mean he'd have to make a sharper right turn than the defendant made left turn, and he would have to signal right turn, would he not? According to Deputy Beer, that is correct. So maybe the sign is misleading to the motorist. I would say you could make an argument that as to the car in the number two lane going to the right, that would be good. But as to what we have in this case is a turn from Lisbon on to Imperial, which would be a left turn movement, which was a degree of 25 to 30 degrees. I would say in that case, based on the specific actions of this car at that intersection, that not only was it a violation of the vehicle code section, but if there was a mistake, it was a mistake of fact and not law. And in the mistake of fact cases, they're much more similar to this type of an analysis than they are a mistake of law. Mistake of law is where the officer didn't know a car had a front license plate. The officer thought a car could not have a placard hanging from a mirror. The car could not have a – had to have a registration tag in the back, all of which was not the law. So, therefore, whatever the officer saw, his belief in the law was wrong, whereas when we're talking about mistake of fact cases, those are much more analogous to this. We have – But the officer didn't give him a ticket. No, he did not. Is there anything in the record that indicates why he didn't? It's in the record that he did not give him a ticket. He didn't give him a ticket because his main purpose was to contact his individual. To stop him. To stop him. However, based on his own PC, which we have set. The resulting search was consent-based? That's correct. Okay. So the only issue was, was the initial stop of the car. But this is most analogous to the United States v. Wallace, the – This is in your brief, isn't it? Yes. And United States v. Cashman. I think the facts are much similar to that, showing this is mistake of fact, not a mistake of law. Thank you, Your Honor. I'd like to quickly make three points. Point number one is Mr. Runyon talks about objective reasonableness. It is objectively reasonable to say that a 15 to 20 degree movement is a left turn which requires a signal. But a 90 to 120 degree movement doesn't require a signal. That's going straight. And I lose. Because that's what their officer who stopped him said. He said, this is a left turn requiring a signal. This is going straight and doesn't require a signal. I would suggest that is not, in the words of this Court, capable of rational explanation. You'd have a better case if he was going right. Pardon me? You'd have a better case if he was going right. Well, I'd be in more trouble if he was going right. Number two, you know, we at pages 20 to 50, the excerpt of record is our expert's testimony on this matter. He was, you know, impeccable credentials. And he says it's not moving from a direct course. Finally, Judge Villa, you brought out the fact or the suggestion that, well, you know, you really do have to turn here. I think all we can do is go with the record. And I direct the Court's attention to pages 183, lines 13 through 18 of the excerpt of record, where their expert was asked the following question and gave the following answer. And isn't it also true that a person can be in the left, in the number two, westbound lane on Lisbon, and be all the way over to and in the westbound lane of the number two lane of Imperial Westbound before he has to start turning left? Answer, yes. I think if we look at this objectively and we take it from an objective officer standard, we know what they were trying to do. They essentially jumped the gun here. They were leaving their jurisdiction. They needed to make a stop. And so they just said, let's just call it a left turn, even though 96 percent of the people going through that intersection never signaled. Thank you. The matter is submitted.
judges: Pregerson, Hawkins, Bea